**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **TERRENCE RUBEN SHEAD** ) | |
|     **ID# 1274940** ) | |
|         **Petitioner,** ) | |
| **vs.** ) | **No. 3:09-CV-0523-K (BH)** |
| ) | |
| **RICK THALER, Director,** ) | **Referred to U.S. Magistrate Judge** |
| **Texas Department of Criminal** ) | |
| **Justice, Correctional Institutions Division,** ) | |
|         **Respondent.** ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b) and an Order of the Court, this case has been referred for findings, conclusions, and recommendation.

**I. BACKGROUND**

On March 13, 2009, petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §§ 2254 challenging his conviction for capital murder in case F-201077-UR. Respondent is Rick Thaler, Director of TDCJ-CID.

**A. Factual History**

The State indicted petitioner for the capital murder of Wilbur Oliver, which allegedly occurred during the commission or attempted commission of a robbery on or about October 13, 2002. (Trial Transcript:2). Petitioner pled not guilty to the charged offense, and he was tried before a jury on December 6-8, 2004. The jury found him guilty, and because the State did not seek the death penalty, the court automatically sentenced him to life imprisonment. (R. 5:34; Tr.:44).

At trial, the State presented evidence that the body of Wilbur Oliver was discovered in the afternoon on October 13, 2002, in a back alley close to Fair Park in Dallas, Texas. (R. 3:16-7). His cell phone was found lying in the grass next to him, and he had a gun shot wound in the chest and

one in the abdomen. (R. 3:22, 24). Two spent cartridges and two live bullets were also found at the scene. (R. 3:23-4). Other than the cell phone, nothing else of value was found on the victim. The body did not appear to have been disturbed and his pockets were not pulled out. A fingerprint, later determined to be petitioner's, was found on the cell phone. (R. 3:24-6, 32-4; R. 4:7-11).

Candice Price, the victim's fiance, testified that she and the victim had traveled to Dallas from Oklahoma with their infant daughter because they had tickets to the UT-OU game, but that they sold their tickets for $1000 near Fair Park prior to the game. (R. 4:26-31). After watching the game in their hotel room with her two cousins, Price and Oliver returned to the Fair Park area because Oliver wanted to meet up with a man named William that he had met earlier, and with whom he had since spoken to by telephone. (R. 4:32-6). Because Price did not want Oliver to go to the location by himself at night, she drove him, and they arrived there after midnight. They met "William", who was wearing a red shirt and a gold chain with a cross, at a car wash near Fair Park. Price identified petitioner as being "William." (R. 4:37-43). After getting in their car with them, petitioner directed them to a new location, and Price drove to this location nearby. She stopped the car in front of a house, petitioner and Oliver exited the car, they returned to retrieve the cell phone so that petitioner could make a phone call, and then they walked away from the car again. Price never saw Oliver or petitioner after this. (R. 4:44-50).

Price testified that when he left with petitioner, Oliver had $500 of the money they had made on the tickets on his person. Oliver did not have any weapon on him, he did not keep weapons in their house, and she had never seen him with a gun. (R. 4:51-2). Price waited at that location for several hours, then returned to her hotel room and waited and called local hospitals. She also began calling Oliver's cell phone and the two telephone numbers Oliver had written down on a piece of paper as being petitioner's numbers. No one answered Oliver's cell phone, but she did speak to a

woman when she called one of petitioner's numbers. She also spoke to petitioner at one point, but the things he said were not true, and his story changed. (R. 4:53-62). Price eventually returned to the area with her daughter that next afternoon and searched the area with the help of some friends. Her friends found Oliver's body in an alley, and Price called the police. (R. 4:64-8).

Shaqualia Jackson testified that petitioner had shown her a black semi-automatic pistol in the weeks before the victim's death, along with gold bullets that looked the same as the bullets found near the victim, and that she had given a statement to the police about this. (R. 4:17-8). Lavelle Gardner testified that he and petitioner attended the same high school. He further testified that he saw petitioner for the first time in several years at a local bazaar on the afternoon of October 13, 2002. Gardner was going to get his hair cut and petitioner was leaving a place that sold gold teeth. (R. 4:99-102). During their conversation, petitioner's cell phone kept ringing. When Gardner asked him who was calling him, petitioner responded that it was the girlfriend of the guy he had robbed and that he had to shoot the guy. (R. 4:103). Petitioner also told Gardner that the robbery involved marijuana. (R. 4:106).

Brandon Curtis testified that in the early morning hours of October 13, 2002, he saw petitioner and petitioner's cousin acting suspiciously at a UT-OU after-party. (R. 4:121-22). When Curtis spoke to petitioner a little while later, petitioner told him that the night before he had met a "dude" from out of town who was supposed to buy drugs from him, and that petitioner intended to rob the man. Petitioner further stated that he took the man through an alley, but that the man pulled a gun on him. While at gunpoint, petitioner pretended to get his wallet but instead reached for his gun and shot the man once or twice. (R. 4:125-26). Curtis further testified that he had seen petitioner with a .9 millimeter handgun, and that petitioner later called him on his cell phone and

began asking Curtis about a completely different shooting that Curtis was involved in. Finally, Curtis testified that he does not go by the name Don Williams. (R. 4:127-29).

Petitioner's mother, Gail Shead, testified that petitioner does not go by the name William, but that in October of 2002, she began receiving calls at her home from a woman looking for a man named William who had been wearing a red shirt and a gold chain. (R. 4:140-41). Ms. Shead then called petitioner and told him to come to her home. He arrived wearing a red shirt. When she asked him who the woman was who had been calling and screaming at her, he responded that it was nothing, and he changed his shirt and left. (R. 4:142). In the early morning hours of October 14, 2002, the police came to her apartment looking for a William. (R. 4:140). When she next spoke to petitioner, he had been released after being questioned by the police. Petitioner told her he had been questioned about a murder case. He and his cousin had met a man from out of town about a drug deal, the man suggested that they walk down the alley, the man had pulled a gun, and petitioner then pulled out his gun and shot the man. (R. 4:144-45).

Two homicide detectives testified that petitioner gave three conflicting written statements to the police about the incident. Initially, when the police questioned petitioner on October 14, 2002, after finding him in the parking lot of his mother's apartment, petitioner left the station and ran away. The officer found him nearby and brought him back to the station. Then, in his first written statement, petitioner stated that he had met the victim at a car wash because the victim was interested in purchasing a pound of marijuana, petitioner had gotten in the car with the victim and taken him to a nearby drug house, and then petitioner left. He also stated that he saw a man named Don Williams the next day, and Don told petitioner that he had killed the victim by shooting him twice in the chest and that he had taken back the marijuana and the man's money. (R. 4:155-56). The police later learned that there was no Don Williams, and that when petitioner told the police that

4

he was calling Don Williams to ask him about the shooting, he had actually called Brandon Curtis. (R. 4:160, 170-71).

When petitioner was questioned by the police again on October 16, 2002, he gave a written statement in which he stated that he had met the man and woman at the car wash for the drug deal, that they drove over to a drug house, and that Lavelle Gardner was at the drug house. Petitioner further stated that Gardner and the man went into the alley, petitioner heard a shot and saw a guy fall, petitioner went to his cousin's house, and that Gardner called him later and asked petitioner to pick him up. Petitioner also stated that he did not own a gun. (R. 4:164-66). Later that day, when the police confronted petitioner with Shaqualia Jackson's statement about his gun, petitioner gave a third written statement in which he stated that he had borrowed the gun three weeks earlier, that he gave Lavelle Gardner the gun, and that Gardner told him that Gardner had stashed the gun behind a particular store. The police looked behind the store several times and never found a gun. They also found no evidence that Lavelle Gardner was at the scene of the shooting. (R. 4:170, 176-180).

## B. **Procedural History**

Petitioner's conviction was affirmed on appeal, after his appellate counsel filed an *Anders* brief. No petition for discretionary review was filed. *Shead v. State*, No. 05-05-00080-CR (Tex. App. – Dallas, April 4, 2006, no pet.).

On November 9, 2006, petitioner filed a state habeas application alleging, among other things, the grounds for relief he raises in his federal petition. (State Habeas Transcript, vol. 1:2).[1] The trial court held hearings on the state application on May 21, 2008, and July 2, 2008, and

---

[1] For identification purposes, volume one of the state habeas transcript is dated September 23, 2008, with the even code "filing," volume two is dated September 29, 2008, and is identified as volume one of the writ hearing, and volume three is also dated September 29, 2008, and is identified as volume two of the writ hearing.

petitioner's trial attorney submitted an affidavit. (S.H.Tr.I: 184-85; S.H.Tr.II:2; S.H.Tr.III:2). The trial court then made findings and recommended that relief be denied. (S.H.Tr.I:168-83). On January 28, 2009, the Court of Criminal Appeals denied relief on the basis of the findings without a written order. (S.H.Tr.I:cover).

On March 13, 2009, petitioner filed his petition for federal habeas relief. (*See* Pet. Writ of Habeas Corpus (Pet.) at 9).[2] Respondent filed a response on August 6, 2009, and provided the state court records. Petitioner filed a reply brief on September 4, 2009. (*See* "Amended Memorandum in Support of Federal Writ of Habeas Corpus").

**C. Substantive Issues**

Petitioner claims that his trial counsel was ineffective for: 1) failing to request a jury instruction on the lesser-included offense of murder; and 2) failing to request a jury instruction on self-defense. Respondent does not contend that petitioner failed to exhaust any of his claims at the state level.

## II. APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

---

[2] *See also Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999) (recognizing that prisoners file their federal pleadings when they place them in the prison mail system).

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000). Here, the denial of petitioner's state writ constitutes an adjudication on the merits of the claims fairly presented to the Texas Court of Criminal Appeals in such writ. The AEDPA standards enumerated in 28 U.S.C. § 2254(d) thus apply to the claims raised in petitioner's federal petition.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established federal law within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] prece-

dent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his first ground for relief, petitioner asserts that his trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of murder. In his second ground for relief, petitioner asserts that his trial attorney was ineffective for failing to request a jury instruction on self-defense.

To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691.

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. Petitioners must "affirmatively prove prejudice." *Id.* at 693. They cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations are also insufficient to obtain habeas relief. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

**A. Failure to Request Jury Instruction on Murder**

First, petitioner contends that his trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of murder. Specifically, petitioner asserts that there was evidence presented through the testimony of Brandon Curtis and Gail Shead that petitioner did not rob or attempt to rob the victim before killing him, which is therefore evidence refuting the robbery element of capital murder.

At the state habeas level, petitioner's trial counsel submitted an affidavit. In this affidavit, counsel states that he did not request a jury instruction on the lesser-included offense of murder because the evidence did not show that, if petitioner was guilty, he was guilty of only murder. In particular, counsel noted that the evidence showed that petitioner was the last person seen with the victim prior to his death, Candice Price testified that Oliver had $500 on him when he met with petitioner, petitioner used Oliver's cell phone; Oliver did not have $500 on him when his body was discovered, and there was no evidence that his body had been ransacked between the time of his death and when it was discovered. Accordingly, counsel concluded that such an instruction was not warranted. (S.H.Tr.I:184). When addressing this issue, the state habeas court found counsel to be trustworthy and found that this decision was a matter of trial strategy. The state court then concluded that petitioner had failed to prove either prong of the *Strickland* standard. (S.H.Tr.I:179-80). Based on these findings, this ground was denied at the state level. (S.H.Tr.I:cover). Petitioner has not shown that the state court's decision is an unreasonable application of the *Strickland* standard.

First, petitioner has not overcome the "strong presumption" that counsel's conduct was not deficient. *See Strickland*, 466 U.S. at 689. To establish that counsel's performance was deficient for failure to request instructions on lesser-included offenses or object to the omission of such instructions, petitioner must first show that he was entitled to such instructions. Texas courts apply a two-part test to determine entitlement to such an instruction. *See Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993) (en banc). "[F]irst, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record *that would permit a jury rationally to find* that if the defendant is guilty, he is guilty only of the lesser offense." *Id.* at 673; *accord* TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon

10

1981) (defining lesser included defense). With respect to the second prong, "[t]he evidence must establish the lesser-included offense as a valid rational alternative to the charged offense." *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000).

While petitioner asserts that there was testimony given at trial by Gail Shead and Brandon Curtis that petitioner neither attempted to or did rob Oliver, the record reveals that Ms. Shead's testimony was silent on that issue. Her testimony, based on the story petitioner told her about what had happened, did not mention petitioner's intent or actions. She instead testified that petitioner told her that he shot Oliver because Oliver had pulled a gun on him, but made no mention of any robbery. (R. 4:144-45). Ms. Shead's testimony does not show that petitioner was entitled to an instruction on the lesser-included offense of murder because it is not evidence from which a jury could rationally find that petitioner was guilty of only murder.

Likewise, Brandon Curtis testified that petitioner told him about his intent to rob Oliver at the time the drug deal was to occur. While petitioner also told Curtis that this intent was evidently interrupted by Oliver pulling a gun on petitioner (R. 4:125-26), this is also not evidence from which a jury could *rationally* find that, if petitioner were guilty, he was guilty of only murder. Because petitioner has not shown that he was legally entitled to a jury instruction on the lesser-included offense of murder, petitioner's trial counsel was not ineffective for failing to request such an instruction. This ground for relief is without merit and should be denied.

**B.     Failure to Request Jury Instruction on Self Defense**

Petitioner next contends that his attorney was ineffective for failing to request a jury instruction on self-defense. Petitioner asserts that there was testimony at trial from Brandon Curtis and Ms. Shead that constituted evidence that petitioner shot Oliver in self-defense after Oliver pulled a gun on him.

At the state habeas level, trial counsel submitted an affidavit in which he stated that he did not request an instruction on self-defense because he believed that the evidence did not warrant such an instruction. In particular, counsel noted that: the physical evidence and Candice Price's testimony proved that Oliver did not have a gun when he went to meet petitioner. The evidence showed that Oliver was shot twice, at close and medium range; the statements petitioner gave to the police were proven to be lies; Lavelle Gardner testified that petitioner had admitted to shooting Oliver but had not mentioned Oliver having a gun; and petitioner's statement to his mother in which he mentioned Oliver having a gun also included a statement that Oliver, an Oklahoma resident unfamiliar with the area, asked to go down an alley with petitioner. Counsel concluded that because of the different statements given by petitioner to the police and the evidence presented at trial, he did not believe that a self-defense instruction was warranted. (S.H.Tr.I:184-85). The state habeas court found that counsel's decision was a matter of trial strategy and that petitioner had failed to prove either prong of the *Strickland* standard. (S.H.Tr.I:180). This ground was denied on its merits by the Court of Criminal Appeals. (S.H.Tr.I:cover). Petitioner has not shown that this denial is an unreasonable application of the *Strickland* standard.

Under Texas law, an accused is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless what the trial court may think about the credibility of the evidence. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). Under Texas statutory law, a defendant is entitled to a jury instruction on self-defense with deadly force if a person is justified in using force against another when and to the degree that he reasonably believes that deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *See* TEX. PENAL CODE ANN. §§ 9.31(a), 9.32 (Vernon 2003). The trial court, however, is not required to give a defensive instruction

if the defendant does not request it. *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). Moreover, the Court of Criminal Appeals has held that a robber has no right of self-defense against his victim, particularly when the victim is justified in acting to recover his property, prevent the offense, or save another person. *Westley v. State*, 754 S.W.2d 224, 230 (Tex. Crim. App. 1988). Therefore, Brandon Curtis' testimony that petitioner told him that the victim pulled a gun on him after petitioner stated that he intended to rob the victim is not testimony that would support a self-defense instruction.

The testimony from Gail Shead does appear to be testimony that might support a self-defense instruction, as she testified that petitioner told her that he shot the victim after the victim pointed a gun at him. (R. 4:144-45). Although this is evidence of self-defense that would support an instruction, it was hearsay evidence that was contradicted by other testimony and evidence. The Court of Criminal Appeals has recognized that even though a particular defense might be available, trial counsel could reasonably decide not to request an instruction and risk losing credibility with the jury because the evidence raising the defense is so unworthy of belief. *Posey v. State*, 966 S.W.2d 57, 63 (Tex. Crim. App. 1998). Trial counsel's affidavit makes clear that he made the strategic decision not to request this instruction because he did not believe that it was warranted by the evidence, given all of the evidence presented at trial that contradicted a self-defense argument. Given petitioner's numerous stories to the police attempting to place the blame on others that were all shown to be false and given the lack of any other evidence supporting a self-defense claim other than petitioner's self-serving statement to his mother, trial counsel was not ineffective in failing to request such an instruction.

Moreover, even if this Court assumes that petitioner's trial counsel was deficient in failing to request this instruction, petitioner has failed to establish prejudice because he has failed to show

13

a reasonable probability that he would not have been convicted of capital murder had a jury instruction on self-defense been given. As noted earlier, other than petitioner's own self-serving statement, there was no other evidence presented at trial that supported petitioner's claim of self-defense. Furthermore, the jury had before it ample evidence that petitioner had lied to the police numerous times and had never asserted a claim of self-defense to the police when given the opportunity to do so, and petitioner was therefore not credible. Petitioner has shown no reasonable probability that, had such an instruction been submitted to the jury, the jury would have acquitted petitioner. This ground for relief is without merit, and it should be denied.

## IV.  EVIDENTIARY HEARING

Upon review of the pleadings filed herein and the proceedings held in state court as reflected in the state-court records, an evidentiary hearing appears unnecessary.

## V.  RECOMMENDATION

The Court should **DENY** with prejudice the request for habeas corpus relief brought pursuant to 28 U.S.C. § 2254.

**SIGNED on this 30th day of September, 2009.**

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

    A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE